**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**NANCY A. MCCASLIN**
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**SERGIO A. LOPEZ**
Indiana Department of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

FILED

Jan 06 2012, 9:39 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| B.B., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 20A03-1104-JT-148 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Stephen R. Bowers, Judge
Cause No. 20C01-1009-JT-71

**January 6, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

P.H. ("Mother") appeals the involuntary termination of her parental rights to her child, claiming there is insufficient evidence supporting the trial court's judgment. We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of P.H., born in April 2008.[1] The facts most favorable to the trial court's judgment reveal that in January 2010, the local Elkhart County office of the Indiana Department of Child Services ("ECDCS") received a referral that, following a breakup with her live-in boyfriend and father of P.H., Mother attempted to stab herself in the head with a pen and was transported to the hospital for a psychiatric evaluation. During ECDCS's investigation of the matter, Mother initially denied but later admitted to having recently used cocaine. Additionally, results of a hair follicle test administered to P.H. came back positive for cocaine, indicating cocaine had been used in P.H.'s presence. The trial court thereafter entered an emergency custody order authorizing ECDCS to remove P.H. from the family home on January 19, 2010, and ECDCS filed a petition alleging P.H. was a child in need of services ("CHINS"). Shortly thereafter, on January 25, 2010, Mother began participating in a chemical residential treatment program as part of the local YMCA Women's Journey Program. Mother completed the Women's Journey program in March 2010, but declined to participate in the Women's Journey twelve-month aftercare program which involved: (1) attending a

---

[1] The parental rights of P.H.'s biological father, M.H. ("Father"), were also terminated by the trial court's judgment. Father does not participate in this appeal. We shall therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

weekly ninety-minute meeting; (2) participating in weekly AA/NA meetings and finding a sponsor; and (3) submitting to regular drug screens.

Meanwhile, in late January 2010, Mother admitted to the allegations of the CHINS petition during an initial hearing on the matter, and P.H. was so adjudicated. Following a dispositional hearing on February 25, 2010, the trial court entered its dispositional order formally removing P.H. from Mother's care and custody and making P.H. a ward of ECDCS. The trial court's dispositional order further directed Mother to participate in and successfully complete a variety of services designed to improve her parenting abilities and to facilitate reunification with P.H. Specifically, Mother was ordered to, among other things: (1) successfully complete a drug treatment program; (2) submit to random drug screen requests and produce consistently negative test results; (3) regularly attend NA/AA groups, obtain a sponsor, and provide ECDCS with documentation evidencing her attendance; (4) exercise regular supervised visitation with P.H.; (5) secure and maintain stable housing and employment; and (5) pay weekly child support for P.H. in the amount of $25.00 per week.

During the next several months, Mother's participation in court-ordered reunification services was sporadic and ultimately unsuccessful. Although she underwent a substance abuse evaluation in May 2011 and thereafter completed an intensive out-patient substance abuse program ("IOP") through Oaklawn in the Fall of 2010, Mother failed to complete the aftercare obligation at that treatment facility, attending only three of the sixteen weekly sessions. Mother continued to refuse to participate in any additional aftercare classes through Oaklawn from October 2010 until approximately

3

one-and-a-half weeks before the termination hearing in March 2011. Additionally, throughout the CHINS and termination proceedings, Mother produced sixteen positive drug screens and refused to participate in four requested screens. Mother also failed to obtain steady employment and to pay weekly child support.

On September 27, 2010, ECDCS filed a petition seeking the involuntary termination of Mother's parental rights. Following a permanency review hearing in January 2011, the trial court adopted ECDCS's recommendation that the permanency plan be changed to termination of parental rights and adoption, with a concurrent plan of reunification. Reunification services, however, remained available to Mother.

Approximately two weeks before the evidentiary hearing on ECDCS's involuntary termination petition was scheduled to begin, Mother filed a Motion in Limine seeking to exclude the admission of any and all evidence pertaining to Mother's oral fluid drug screen tests performed by ASL Testing during the termination hearing, alleging that ASL's testing procedures were unreliable and created an unconstitutional risk of error. A hearing on Mother's Motion in Limine was held immediately before the commencement of the termination hearing on March 25, 2011. During the hearing, counsel for Mother argued that the drug testing procedures used by ECDCS's contracted service provider, ASL Testing ("ASL"), did not comply with federal guidelines and thus all of ASL's test results pertaining to Mother were inadmissible and did not meet constitutional muster. In denying Mother's motion, the trial court stated that the drug testing at issue was mandated through a CHINS case, not a federal workplace obligation, and thus Mother's reliance on the federal statute detailing Mandatory Guidelines for Federal Workplace

4

Drug Testing Programs was misplaced. The trial court further determined that Mother's arguments to exclude the drug test results were applicable to the weight of the evidence at issue, not to its admissibility.

During the termination hearing, ECDCS presented substantial evidence concerning Mother's failure to successfully complete a majority of the trial court's dispositional goals, including achieving employment and housing stability, obtaining her G.E.D., refraining from the use of illegal substances, and demonstrating she is capable of providing P.H. with a safe and stable home environment. ECDCS also presented evidence establishing Mother's lengthy history of involvement with ECDCS, which includes the prior involuntary termination of Mother's parental rights to three older children, on-going criminal activities and relationship with Father during the underlying proceedings, and twenty-five year addiction to cocaine and/or other controlled substances. As for P.H., ECDCS presented evidence showing the child was living and thriving in foster care where she was closely bonded to her pre-adoptive foster family.

Regarding the accuracy of Mother's positive drug screen results during the underlying proceedings, ECDCS presented evidence showing ASL is a state contracted service provider that had performed oral fluid drug screen testing for ECDCS for more than one year. Additionally, ASL employee Kathleen Dorson ("Dorson") testified that the collection and testing procedures utilized by ASL's laboratory are governed by the federal mandates set forth in the Clinical Laboratory Improvement Act ("CLIA"), not the Mandatory Guidelines for Federal Workplace Testing cited by Mother which apply only to federal agencies and are used for urine drug testing, not oral fluid testing. Dorson also

5

explained that the "cut-off level" for positive screens under CLIA regulations is lower than those mandated in the federal workplace guidelines. Transcript at 282, 285.

At the conclusion of the termination hearing, the trial court took the matter under advisement. Several days later, the trial court entered its judgment terminating Mother's parental rights to P.H. Mother now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Here, in terminating Mother's parental rights, the trial court entered specific factual findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. L.S., 717 N.E.2d at 208.

6

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, the State is required to allege and prove, among other things:

(A) that one (1) of the following is true:

(i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

* * *

(iii)   The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

7

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

(C) that termination is in the vest interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the   child.

Ind. Code § 31-35-2-4(b)(2) (2010) (emphasis added).  The State's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)).  Moreover, Indiana Code section 31-35-2-8(b) provides that if a trial court does not find that the allegations in the termination petition are true, "the court *shall* dismiss the petition."  Id. (Emphasis added).  Mother asserts on appeal that ECDCS failed to establish, by clear and convincing evidence, each of the above-cited sections of Indiana's termination statute.  See Ind. Code § 31-35-2-4(a)(2)(A)-(D).

## I. Removal of Child

Mother first alleges ECDCS failed to prove P.H. was removed from her care pursuant to a dispositional decree for the requisite six-month time period set forth in Indiana Code section 31-34-2-4(b)(2)(A).  In so doing, Mother argues P.H. was initially removed from her care in January 2010 pursuant to an "emergency custody order," rather than under a dispositional order, and thus subsection (b)(2)(A)(i) of the termination

8

statute was not satisfied. Appellant's App. at 13. Mother further asserts that when ECDCS filed its termination petition on September 27, 2010, P.H. "had not been out of the [family] home for the required time period" of fifteen of the most recent twenty-two months, as is contemplated by subsection (b)(2)(A)(iii). Id. at 14. Mother therefore contends she is entitled to reversal because ECDCS failed to prove the requisite elements of subsection (b)(2)(A).

We pause to emphasize that before an involuntary termination of parental rights may occur, ECDCS need only establish one of the three requirements of subsection (b)(2)(A) by clear and convincing evidence. See Ind. Code § 31-35-2-4(b)(2)(A). Mother is correct in her assertions that P.H. was initially removed from the family home pursuant to an emergency custody order in January 2010 and that P.H. had not been removed from the family home for fifteen of the most recent twenty-two months as of the time of the filing of the involuntary termination petition. However, the record makes clear that the trial court formally removed P.H. from Mother's care and custody pursuant to a dispositional order dated February 25, 2010.

Removal "under a dispositional decree" refers to a dispositional decree that authorizes an out-of-home placement. In re B.D.J, 728 N.E.2d 195, 200 (Ind. Ct. App. 2000). Here, the trial court's dispositional order dated February 25, 2010, specifically states that ECDCS "is given responsibility for placement and care of [P.H.]." Appellant's App. at 74. This dispositional order further provides: "[ECDCS] is awarded wardship of the child, with responsibility for supervision and placement. The rights and obligation of the person granted wardship in this case as defined by I.C. 31-9-2-134.5 are hereby

9

modified to conform to the terms of this Dispositional Decree and the Parent Participation Plan ordered herein." Id. at 75. Thus, contrary to Mother's assertions on appeal, P.H. was clearly removed from Mother's care pursuant to a dispositional order on February 25, 2011. Moreover, by the time ECDCS filed its involuntary termination petition on September 27, 2010, P.H. had been removed from the family home pursuant to a dispositional order for approximately seven months. We therefore conclude ECDCS satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(A)(i).

## II. Sufficiency of the Evidence

Mother next asserts that ECDCS failed to provide sufficient evidence to support the trial court's judgment as to subsections (b)(2)(B)-(D) of the termination statute cited above. The gravamen of Mother's arguments is that P.H. was removed from her care because Mother admitted to using cocaine, but that this condition had been "rectified" by the time of the termination hearing. Appellant's Brief at 27. Mother therefore asserts termination of her parental rights was "contrary to the evidence" supporting reunification. Id.

## A. Conditions Remedied/Threat to Well-Being

As with subsection (b)(2)(A), Indiana's termination statute provides that ECDCS need establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court may terminate parental rights. Because we find it to be dispositive under the facts of this particular case, we shall only consider whether clear and convincing evidence supports the trial court's findings regarding subsection (b)(2)(B)(i), namely, whether there is a reasonable probability the conditions

resulting in P.H.'s removal or continued placement outside the family home will be remedied.

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The trial court may also consider any services offered to the parent by the local Indiana Department of Child Services office (here, ECDCS) and the parent's response to those services, as evidence of whether conditions will be remedied. Id. Moreover, ECDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

In the present case, the trial court's judgment contains numerous detailed findings regarding Mother's unresolved parenting and substance abuse issues. Specifically, the trial court noted Mother's lengthy history of involvement with ECDCS, which "precedes this case" and includes the involuntary termination of Mother's parental rights to three older children. Appellant's App. at 11. Although the court acknowledged Mother

11

completed an IOP during the underlying proceedings, it further found that Mother never completed the recommended aftercare program. In addition, the trial court specifically found:

xv. If the issue in this case had been casual drug use by [Mother], lack of full compliance with court[-]ordered drug treatment, aftercare, and AA/NA would not be so severely scrutinized, and her lack of full compliance might not weigh in favor of termination. But [Mother's] addictions assessment and her history support a finding that she has a twenty[-]year history of drug use and addiction with serious criminal and personal consequences. With that in mind, case manager Welles states that [Mother's] lack of full compliance in attending aftercare and AA/NA was setting her up to fail and relapse yet again.

* * *

xxiii. Drugs are not the only issue that [Mother] is addressing at this time that pose a threat to her child and support a finding that the conditions that led to removal will not be remedied. Anthony Weaver described that he is [Mother's] probation officer. He testified that [Mother] has been on probation since April 1, 2010, on a charge of domestic battery. He described that he filed a violation in her case based upon allegations of a failed drug screen and is asking that she spend a year in jail. The violation is set for hearing on March 29, 2011.

* * *

xxvi. On the day of the termination hearing [Mother], by her own admission, was unemployed, and had failed to obtain the case goal of earning her G.E.D. . . . On the day of the termination hearing, [ECDCS] case manager Angela Welles testified that [Mother] had not completed the mandated aftercare treatment to address her addiction, and has not provided proof of attendance at AA/NA; moreover, the proof of attendance [Mother] presented during the evidentiary hearing was for far less attendance than was ordered. Finally[,] refused drug screens can be and are construed as positive drug screens[,] and [Mother] refused four drug screens in this case. According to [Mother], as disclosed in the addictions assessment, Exhibit E, her drug use began when she was 14-years old and has

12

included huffing, marijuana, methamphetamine[,] and the intravenous use of crack cocaine. Angela Welles testified, and Exhibits C and D evidence[,] that [Mother's] parental rights were terminated on three older children because of drug use and domestic violence. [P.H.] was removed from her parents because of drug use[,] and drugs have continued to be an issue as evidenced by [M]other's refused drug screens. The present and habitual pattern of conduct of [Mother] both support the conclusion[,] by clear and convincing evidence[,] that there is a reasonable probability that the conditions that resulted in the removal of the child from the home will not be remedied.

Id. at 18-19. A thorough review of the record leaves us satisfied that abundant evidence supports the trial court's findings cited above, which in turn support the court's ultimate decision to terminate Mother's parental rights to P.H.

During the underlying CHINS and termination cases, ECDCS referred Mother for multiple services designed to improve her parenting abilities and to address her substance abuse issues. The record reveals, however, that Mother refused to participate in and/or successfully complete those services. For example, Addictions Therapist Pamela Miller confirmed during the termination hearing that although Mother completed the substance abuse "power program at Oaklawn," Mother attended only three of the sixteen weekly aftercare classes and ceased all participation in the program after September 2010. Transcript at 16.

ECDCS case manager Angela Welles ("Welles") likewise confirmed that during the CHINS and termination cases Mother tested positive for cocaine sixteen times and refused to submit to four additional requests for drug screens. Welles also testified Mother had failed to provide ECDCS with documentation concerning her participation in AA/NA meetings, was "arrested twice during the case for domestic violence," and was

13

"thirteen hundred dollars behind" in her court-ordered child support obligation for P.H. Id. at 203, 216. When questioned as to why P.H. was never returned to Mother's care, Welles informed the trial court that "there was no evidence of any permanent[,] lasting change. . . . [T]here was continued positive drug screens, mixed with negative drug screens also . . . but because [P.H.] was exposed to cocaine, any positive drug screen is a big red flag." Id. at 203.

Mother's own testimony confirmed that she was unemployed at the time of the termination hearing, had failed to obtain her G.E.D., had not completed a substance abuse aftercare program, and failed to attend NA/AA meetings three times a week as recommended by her addictions therapist. Additionally, when questioned as to when she last used cocaine, Mother admitted that she had used cocaine on January 22, 2011, following a court hearing in the underlying proceedings.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged conditions, supports a finding that there exists no reasonable probability that the conditions will change." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), trans. denied. Moreover, we have previously explained that "simply going through the motions of receiving services alone is not sufficient if the

services do not result in the needed change." In re J.S., 906 N.E.2d 226, 234 (Ind. Ct. App. 2009).

It is clear from the language of the judgment that the trial court gave more weight to the evidence of Mother's habitual patterns of neglectful conduct, substance abuse, failure to complete court-ordered services, and persistent inability to provide P.H. with a safe and stable home environment, than to Mother's purported change in circumstances, which the court was permitted to do. See Bergman v. Knox County Office of Family & Children, 750 N.E.2d 809, 812 (Ind. Ct. App. 2001) (concluding trial court was permitted to and in fact gave more weight to abundant evidence of mother's pattern of conduct in neglecting her children during several years before the termination hearing than to mother's testimony that she had changed her life to better accommodate the children's needs). Mother's arguments on appeal, emphasizing her self-serving testimony, including her arguments concerning the conflicting drug screen results, as opposed to the evidence cited by the trial court in its termination order, amount to an invitation to reweigh the evidence, which we may not do. D.D., 804 N.E.2d at 265.

### B. Best Interests

In support of her assertion that the trial court erred in finding termination of her parental rights is in P.H.'s best interests, Mother states that the trial court improperly based its decision on the facts Mother "lacked a job, had a history of addiction and criminal convictions, had recent positive drug screens, and was facing a probation violation which might lead to incarceration," because these facts were "addressed" by Mother in her earlier arguments and were "shown to have been remedied" or to be "facts

15

the court should not have considered in making its determination." Appellant's Brief at 26. Mother's assertions here are unavailing, however, as we have already determined that the evidence supports the trial court's determination that these conditions had not been remedied and/or were properly considered.

In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. McBride v. Monroe County Office of Family & Children, 798 N.E.2d 185 (Ind. Ct. App. 2003). In so doing, the trial court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations of both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re M.M., 733 N.E.2d 6.

In addition to the findings previously discussed, the trial court made several additional pertinent findings in its judgment pertaining to P.H.'s best interests. Although the court recognized there is "no doubt" Mother loves P.H., it also correctly found that the "purpose of a termination of parental rights proceeding is not to measure a parent's love or commitment to a child" or to "punish" the parents, but it is to protect the child. Appellant's App. at 19; see also In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (stating purpose of terminating parental rights is not to punish parents but to protect their children). The court also noted court-appointed special advocate Kristal Klehfoth's

16

("Klehfoth") testimony that P.H. "needs a caregiver who can provide her with "stability and safety" in order to "thrive," but that Mother is "simply unable to meet those needs." Id. at 19-20. Finally, the court's findings acknowledged case manager Welles' testimony that P.H. "needs stability," and that Mother's pending probation revocation hearing and possible incarceration if the allegations are found to be true would make Mother "unavailable to care for [P.H.]." Id. at 20. These findings, too, are supported by the evidence.

In recommending termination of Mother's parental rights, Klehfoth informed the trial court that she remained concerned over Mother's lack of stability and on-going substance abuse issues. Klehfoth also reported having observed a "big difference" between P.H.'s demeanor when in her Mother's care, as opposed to when she is in the foster home, stating P.H. appeared to be "under stress" when visiting with Mother and that the child takes "too much" responsibility for Mother's "emotions and well-being." Transcript at 262. Klehfoth also testified that P.H. was "very attached" to her foster mother and experienced "a lot of separation anxiety" when separated from her foster mother. Id. at 263. Additionally, Klehfoth reported that P.H.'s foster family "is very safe and stable and gives [P.H.] the stability she needs." Id. at 263. Welles likewise described P.H. as "doing very well" in her current foster home. Id. at 229. When asked why she believed termination of Mother's parental rights is in P.H.'s best interests, Welles answered, "Because [P.H.] needs a strong home. . . . [S]he thrives with structure. . . . [S]he needs a parent that's going to be there for her every day. . . . [S]he needs not to be exposed to further illegal drugs[,]. . . [and] she needs permanency." Id. at 230.

17

Based on the totality of the evidence, including Mother's unresolved substance abuse issues and current inability to demonstrate she is capable of providing P.H. with the safe and stable home environment she needs, coupled with the testimony from Welles and Klehfoth, we conclude that clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in P.H.'s best interests.

### C. Satisfactory Plan

Finally, we consider Mother's assertion that ECDCS failed to prove it had a satisfactory plan for the future care and treatment of P.H. Again, Mother bases her allegation of error here on her sole contention that her parental right "should not have been terminated" because she "rectified conditions that led to removal, and [thus,] the plan for adoption is contrary to the evidence. . . ." Appellant's Brief at 27.

Indiana Code Section 31-35-2-4(b)(2)(D) provides that before a trial court may terminate a parent-child relationship, it must find there is a satisfactory plan for the future care and treatment of the child. Id.; see also D.D., 804 N.E.2d at 268. It is well-established, however, that this plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. Id. ECDCS's plan is for P.H. to be adopted by the child's current foster family which has expressed an interest to do so. This plan provides the trial court with a general sense of the direction of P.H.'s future care and treatment. ECDCS's plan is therefore satisfactory. See id. (concluding that State's plan for child to be adopted by current foster parents or another family constituted a suitable plan for future care of child).

18

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Public Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)).  We find no such error here.

Affirmed.

RILEY, J., and MAY, J., concur.